Kristin L. Cleveland (State Bar No. 184639)
kristin.cleveland@klarquist.com
KLARQUIST SPARKMAN, LLP
121 SW Salmon Street, Suite 1600
Portland, OR 97204
Telephone:    +1.503.595.5300
Facsimile:    +1.503.595.5301

*Attorneys for Defendant*
*STRIPE, INC.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **TRANSACTION SECURE, LLC,** | Case No. 5:19-cv-04052-EJD |
| Plaintiff, | **DEFENDANT STRIPE, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT FOR PATENT INFRINGEMENT UNDER FED. R. CIV. P. 12(b)(6) (INVALIDITY UNDER 35 U.S.C. § 101)** |
| v. | |
| **STRIPE, INC.,** | |
| Defendant. | |

Date:   February 6, 2020
Time:  9:00 am
Courtroom: 4 (San Jose)
Judge: Hon. Edward J. Davila

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION TO DISMISS .................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED ........................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

I.      INTRODUCTION ........................................................................................................ 1

II.     BACKGROUND .......................................................................................................... 3

        A.      The Patent's Business Problem......................................................................... 3

        B.      The Patent's Proposed Business Solution......................................................... 4

        C.      Representative Claim 1 ..................................................................................... 5

III.    LEGAL STANDARD.................................................................................................... 7

IV.     ARGUMENT ................................................................................................................ 8

        A.      The Federal Circuit Has Affirmed Judgment Of
                Invalidity Under *Alice* Of Very Similar Claims As Asserted Here ........................ 9

        B.      *Alice* Step One: The Claims Are Directed To An Abstract Business
                Idea.................................................................................................................... 14

        C.      *Alice* Step Two: The Claims Add No Inventive Application .............................. 19

        D.      Claim 1 Is An Appropriate Representative Claim ................................................ 23

        E.      This Invalidity Defense Is Ripe For Decision Under Rule 12 .............................. 24

V.      CONCLUSION........................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice Corp Pty. Ltd. v. CLS Bank Int'l,*
573 U.S. 208 (2014) ........................................................................................... passim

*Asghari-Kamrani v. United Servs. Auto. Ass'n,*
No. 2:15-cv-478, 2016 WL 3670804 (E.D. Va. July 5, 2016) .......................... passim

*Asghari-Kamrani v. United Servs. Auto. Ass'n,*
737 F. App'x 542 (Fed. Cir. 2018) ............................................................................. 3

*BASCOM Global Internet Servs. v. AT&T Mobility LLC,*
827 F.3d 1341 (Fed. Cir. 2016) ........................................................................... 15, 16

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................................................. 24

*Berkheimer v. HP Inc.,*
881 F.3d 1360 (Fed. Cir. 2018) ..................................................................... 8, 22, 25

*BSG Tech. LLC v. BuySeasons, Inc.,*
899 F.3d 1281 (Fed. Cir. 2018) ............................................................................... 22

*ChargePoint, Inc. v. SemaConnect, Inc.,*
920 F.3d 759 (Fed. Cir. 2019) .............................................................. 8, 16, 20, 24

*Credit Acceptance Corp. v. Westlake Servs.,*
859 F.3d 1044 (Fed. Cir. 2017) ......................................................................... 13, 15

*CyberSource Corp. v. Retail Decisions, Inc.,*
654 F.3d 1366 (Fed. Cir. 2011) ......................................................................... 18, 22

*DDR Holdings, LLC v. Hotels.com, L.P.,*
773 F.3d 1245 (Fed. Cir. 2014) ............................................................................... 20

*Diamond v. Diehr,*
450 U.S. 175 (1981) ................................................................................................. 21

*EasyWeb Innovations, LLC v. Twitter, Inc.,*
689 F. App'x 969 (Fed. Cir. 2017) .......................................................................... 14

*Eclipse IP LLC v. McKinley Equip. Corp.,*
No. SACV 14-154-GW AJWX, 2014 WL 4407592 (C.D. Cal. Sept. 4, 2014) ......... 9

*Elec. Power Grp., LLC v. Alstom S.A.,*
   830 F.3d 1350 (Fed. Cir. 2016) ................................................................ 2, 7, 14, 16

*Enfish, LLC v. Microsoft Corp.,*
   822 F.3d 1327 (Fed. Cir. 2016) ......................................................................... 7, 9, 16

*Genetic Techs. Ltd. v. Merial L.L.C.,*
   818 F.3d 1369 (Fed. Cir. 2016) ................................................................................ 24

*Glasswall Solutions, Ltd. v. Clearswift Ltd.,*
   754 F. App'x 996 (Fed. Cir. 2018) .......................................................................... 23

*GoDaddy.com LLC v. RPost Commc'ns Ltd.,*
   No. CV-14-00126-PHX-JAT, 2016 WL 3165536 (D. Ariz. June 7, 2016) ............. 14

*In re Bilski,*
   545 F.3d 943 (Fed. Cir. 2008) ............................................................................ 8, 22

*In re Greenstein,*
   No. 2019-1382, 2019 WL 3060986 (Fed. Cir. July 12, 2019) ................................... 4

*In re TLI Commc'ns LLC Patent Litig.,*
   823 F.3d 607 (Fed. Cir. 2016) .................................................................................. 16

*Intellectual Ventures I LLC v. Symantec Corp.,*
   838 F.3d 1307 (Fed. Cir. 2016) ........................................................................... 7, 16

*Internet Patents Corp. v. Active Network, Inc.,*
   790 F.3d 1343 (Fed. Cir. 2015) .................................................................................. 7

*Interval Licensing LLC v. AOL, Inc.,*
   896 F.3d 1335 (Fed. Cir. 2018) ................................................................................ 22

*Local Intelligence, LLC v. HTC Am., Inc.,*
   No. 5:17-cv-06437-EJD, 2018 WL 1697127 (N.D. Cal. Apr. 6, 2018) ..................... 7

*OpenTV, Inc. v. Apple Inc.,*
   No. 5:15-cv-02008-EJD, 2016 WL 344845 (N.D. Cal. Jan. 28, 2016) ................. 8, 20

*Prism Techs. LLC v. T-Mobile USA, Inc.,*
   696 F. App'x 1014 (Fed. Cir. 2017) ........................................................................ 14

*Recognicorp, LLC v. Nintendo Co.,*
   855 F.3d 1322 (Fed. Cir. 2017) ................................................................... 13, 18, 19

*SAP Am., Inc. v. InvestPic, LLC,*
   898 F.3d 1161 (Fed. Cir. 2018) ....................................................................... passim

- iii -

*Secure Cam, LLC v. TendInsights, Inc.*,
  351 F. Supp. 3d 1249 (N.D. Cal. 2018) ........................................................ 7, 15, 24

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
  873 F.3d 905 (Fed. Cir. 2017) ............................................................................ 13, 24

*Smart Sys. Innovations, LLC v. Chicago Transit Auth.*,
  873 F.3d 1364 (Fed. Cir. 2017) ................................................................................. 13

*Thales Visionix Inc. v. United States*,
  850 F.3d 1343 (Fed. Cir. 2017) ................................................................................. 20

*Trading Techs. Int'l, Inc. v. IBG LLC*,
  921 F.3d 1378 (Fed. Cir. 2019) ................................................................................... 7

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
  874 F.3d 1329 (Fed. Cir. 2017) ................................................................................. 21

*Ultramercial, Inc. v. Hulu, LLC*,
  772 F.3d 709 (Fed. Cir. 2014) ................................................................................... 22

*Univ. of Florida Research Found., Inc. v. Gen. Elec. Co.*,
  916 F.3d 1363 (Fed. Cir. 2019) ..................................................................... 15, 21, 24

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
  793 F.3d 1306 (Fed. Cir. 2015) ................................................................................. 20

*Voter Verified, Inc. v. Election Sys. & Software LLC*,
  887 F.3d 1376 (Fed. Cir. 2018) ................................................................................. 24

**Statutes**

35 U.S.C. § 101 ......................................................................................................... passim

**Rules**

Fed. R. App. P. 36 .............................................................................................................. 3

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 1, 3, 24

- iv -

1

## NOTICE OF MOTION AND MOTION TO DISMISS

2      PLEASE TAKE NOTICE that on Thursday, February 6, 2020, at 9:00 am, or as soon

3  thereafter as the matter may be heard before the Honorable Judge Edward J. Davila in the United

4  States District Court for the Northern District of California, Courtroom 4, located on the 5th floor

5  of the United States Courthouse, at 280 South 1st Street, San Jose, CA 95113, Defendant Stripe,

6  Inc. by and through its attorneys, will and hereby does move the Court to dismiss the action

7  pursuant to Fed. R. Civ. P. 12(b)(6) because the patent claims asserted in the Amended Complaint

8  are invalid as claiming patent-ineligible subject matter. The motion will be and is based on this

9  Notice of Motion and Motion to Dismiss, the accompanying Memorandum of Points and

10 Authorities and Declaration of Kristin Cleveland, the pleadings and papers filed herein, and the

11 argument of counsel at the time of hearing.

12

## STATEMENT OF ISSUES TO BE DECIDED

13     Defendant Stripe, Inc. moves under Fed. R. Civ. P. 12(b)(6) to dismiss the Amended

14 Complaint (ECF No. 24) for failure to state a claim because the claims of U.S. Pat. No. 8,738,921

15 are invalid under 35 U.S.C. § 101. The issue to be decided is one of law: whether the asserted

16 patent claims encompass patent-ineligible subject matter.

17

## MEMORANDUM OF POINTS AND AUTHORITIES

18 **I.      INTRODUCTION**

19     The patent claims of U.S. Pat. No. 8,738,921 (the "'921 patent") are invalid under 35

20 U.S.C. § 101 because they claim an abstract alleged business solution to a business problem. As

21 described by the '921 patent, the business problem is the prevalence of identity theft.

22     The patent's business solution to this business problem is for the business ("transactional

23 entity") to trust a third party ("trusted entity") to vouch that a person is who she purports to be. Per

24 the patent's business solution, the person trusts the trusted entity to keep her personal information

25 confidential and the business trusts the trusted entity's word that the person is who she says she is.

26

27

28

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS
AMENDED COMPLAINT UNDER FED. R. CIV. P. 12(b)(6)

1    In other words, the patent's business solution is intermediated authentication: using a

2    trusted entity with a secure repository of a

3    person's personal identity information to

4    authenticate that person's identity to a

5    business. This business idea is at least as

6    plainly a patent-ineligible abstract idea as

7    was the idea of "intermediated settlement"

8    in *Alice Corp Pty. Ltd. v. CLS Bank Int'l*,

9    573 U.S. 208, 218 (2014), and myriad other

10   ideas for processing information in service

11   of a business transaction that have been

12   declared patent ineligible in progeny of *Alice*.



'921 patent Figure 1 (modified)

13   In its Amended Complaint, Plaintiff suggests that the patent is also directed to a second

14   (abstract) idea: transforming personal identity information (SSN, birthdate, etc.) that is easily

15   decipherable by providing a unique alpha-numeric code containing that same information that is

16   undecipherable to the human eye. (ECF No. 24, ¶ 23.)[1] While representative claim 1 includes using

17   a "unique code," nothing about using a unique code, or any alleged ingredients of a unique code,

18   saves the claim. Encoding information is just another abstract idea.

19   In deciding questions of patent eligibility, the Federal Circuit routinely compares the claims

20   to those previously analyzed under *Alice*. *See*, *e.g.*, *Elec. Power Grp., LLC v. Alstom S.A.*, 830

21   F.3d 1350, 1351–54 (Fed. Cir. 2016). In the instant case, the Federal Circuit has affirmed another

22   court's invalidation of patent claims on essentially the same abstract ideas under *Alice* and section

23   101 on a motion to dismiss. *Asghari-Kamrani v. United Servs. Auto. Ass'n*, No. 2:15-cv-478, 2016

24   WL 3670804, at *4 (E.D. Va. July 5, 2016) ("The claims are directed to the abstract idea of using

25

26   ───────────────────

27   [1] For the purposes of this motion only, Stripe does not challenge these statements in the

28   Amended Complaint. (ECF No. 24 at ¶¶ 18, 22–25.)

a third party and a random, time-sensitive code to confirm the identity of a participant to a transaction."). The Federal Circuit affirmed pursuant to Fed. R. App. P. 36. *Asghari-Kamrani*, 737 F. App'x 542 (Fed. Cir. 2018), *cert. denied,* 139 S. Ct. 1460 (2019).

This motion presents a question of law ripe for decision on the pleadings. It requires no claim construction and no fact finding. This is because the patent itself makes clear that the only non-abstract portions of the claims are conventional, generic elements, namely a "computer system" and "secure repository." Neither the patent nor the Amended Complaint suggests that either of these elements is unconventional. As the patent's claims are directed to abstract ideas implemented with only generic elements, the Amended Complaint fails to state a plausible claim for relief and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

## II.    BACKGROUND

### A.    The Patent's Business Problem

The problem addressed by the '921 patent is identity theft: an imposter can use a person's name, birthdate, or other personal information to trick a bank or other "transactional entity" into believing that the imposter is that person. The '921 patent describes an example of this problem in the context of Social Security Numbers ("SSNs"). In theory, a SSN uniquely identifies a person. Therefore, in theory, a bank or other business wanting to transact with a person would need only to receive from that person her SSN to verify (authenticate) that she is who she says she is. However, as described by the '921 patent, SSNs (and birthdates and other personal identity information) are widely shared and therefore can be learned by an imposter. An imposter can use the person's SSN to pretend to be that person and, in effect, steal her identity. This creates the primary problem the patent purports to address: businesses fearing identity theft cannot simply trust that someone possessing a person's SSN or other personal identity information is, indeed, that person. ('921 patent, 1:65–2:30.)[2]

---

[2] U.S. Pat. No. 8,738,921 is the only patent asserted in this case; it is filed as Exhibit A to the to the Amended Complaint (ECF No. 24-1) and is referred to herein as the "'921 patent."

The patent explains this problem as follows:

> The difficulty most transactional entities encounter is definitively authenticating a person's identity for the first time. In the past, companies assumed knowledge of a SSN, birthday, and other basic personal information was sufficient to prove a person's identity. But now, knowledge of a SSN, birthday, and other basic personal information is not sufficient to prove identity . . . .

('921 patent, 6:11–27.)

This is a business problem, not a technological one. *Cf. In re Greenstein*, No. 2019-1382, 2019 WL 3060986, at *3 (Fed. Cir. July 12, 2019) (non-precedential) ("the problem of trustworthy recommendations is a business problem, not a technical one").

## B.   <u>The Patent's Proposed Business Solution</u>

The '921 patent's solution to this business problem is to trust a third party to vouch that a person is who she purports to be. In place of relying on unreliable SSNs, etc., the patent's idea is using a trusted entity with a secure repository of a person's personal identity information to authenticate to a business that person's identity. The preamble to claim 1 explicitly states that it is directed to "[a] method for authenticating a person's identity to a transactional entity using a trusted entity with a secure repository of a person's personal identity information." The trusted entity can use a unique code to authenticate the person.

The patent describes the Social Security Administration ("SSA")—an example of a trusted entity—providing to a person not only a SSN but also a personal identification number ("PIN") to verify that SSN. When the person wants to be authenticated to a bank or other business, she provides the PIN along with her SSN. (The patent calls this combination of the SSN (or other "personal identifier") and the PIN (or other "key") a "unique code." ('921 patent, 7:24–27.)) The bank checks with the SSA that this SSN and PIN are correct for this person. When the SSA confirms this, the bank ("transactional entity") trusts that the person is who she says she is (*i.e.*, she is authenticated) without having to take any other steps to authenticate the person. (*Id.*, 3:66–4:18, 13:34–50.)

Although not described in the patent, the Amended Complaint asserts that the trusted entity maintains confidentiality of personal identity information by "transforming personal identity information (SSN, birthdate, etc.) that is easily decipherable by providing a unique alpha-numeric code containing that same information that is undecipherable to the human eye, which mitigates the possibility of identity theft." (ECF No. 24, ¶ 23; *see also id*. ¶¶ 18, 22, 25.)

The patent asserts several purported advantages for its business idea. For example:

> An advantage of this embodiment is that the person can avoid divulging their personal information to a transactional entity in order for the person to transact business with the transactional entity. Another result is that the transactional entity can have a greater confidence level than using traditional verification methods that the person they are transacting with is the true owner of the identity and information used in the transaction.

('921 patent, 3:58–65, *see also id*., 6:28–39, 6:53–58.)

The '921 patent does not describe improvements to a computer system, but merely discloses embodiments in which the trusted entity can use a "computer system." The specification also makes clear that claimed steps can be done by humans. For example, communications can be made by "human operators" or "human delivery." ('921 patent, 6:67–7:11, 8:25–40, 8:63–9:1.) The patent expressly states that the "person's identity authentication or rejection 238 may be delivered using a computer network . . . or <u>human delivery systems</u>." (*Id*., 8:63–9:1 (emphasis added); *see also id*., 8:25–29 ("unique code . . . can be delivered using a computer network . . . or human delivery systems.")) The specification also teaches that the "trusted entity's system can use a secure repository . . . <u>human operators</u> or combination thereof." (*Id*., 7:6–11 (emphasis added).) Similarly, the "person user interface can comprise a web page, computer terminal, computer display, automated telephone system, <u>telephone operator</u>, or <u>representative employed by the trusted entity</u> 220." (*Id*., 7:7–11 (emphases added); *see also id*., 8:37–40 ("The transactional entity user interface can be a . . . telephone operator, or representative employed by the trusted entity."))

## C.   <u>Representative Claim 1</u>

The '921 patent presently is asserted in five other actions in three districts. To date, motions to dismiss the original complaints have been filed in two other cases, on the same grounds asserted

here.[3] In one of those actions, Plaintiff took the position that claim 1 is an appropriate representative claim. (Cleveland Decl., Ex. A at ¶ 4.) In this case, the Amended Complaint continues to expressly assert only claim 1. (ECF No. 24 at ¶ 26.)

Claim 1 encompasses the exchange of information between three entities: a transactional entity (e.g., a business), a person wanting to do business with that transactional entity, and an entity trusted by the first two. Each step in claim 1 receives, stores, provides or confirms information:

> 1. A method for authenticating a person's identity to a transactional entity using a trusted entity with a secure repository of a person's personal identity information, comprising:
>
> receiving personal identity information at a trusted entity computer system, the personal identity information being confidentially stored by the trusted entity computer system;
>
> in the secure repository, storing a user identifier and a password that are associated with, but do not contain, the personal identity information;
>
> at the trusted entity computer system, receiving a request from the person for a unique code, the request including the user identifier and the password, the person's identity having been previously authenticated by the trusted entity computer system;
>
> providing the unique code to the person, the unique code comprising a person identifier and a key, wherein the unique code is thereafter transmitted to a transactional entity to identify the person without providing the personal identity information to the transactional entity; and
>
> the trusted entity computer system confirming the unique code to the transactional entity to verify the person's identity.

('921 patent, 13:65–14:22 (emphases added).)

_____

[3] _See Transaction Secure, LLC v. DeviantArt, Inc._, No. 2:19-cv-05836-PSG-RAO (C.D. Cal. July 8, 2019) (motion to dismiss original complaint filed as ECF No. 24); _Transaction Secure, LLC v. Facebook, Inc. d/b/a Instagram_, No. 5-19-cv-04355-EJD (N.D. Cal. July 30, 2019) (motion to dismiss original complaint filed as ECF No. 21); _Transaction Secure, LLC v. GitHub, Inc._, No. 5-19-cv-04050-EJD (N.D. Cal. July 15, 2019); _Transaction Secure, LLC v. Fitbit, Inc._, No. 5-19-cv-04075-EJD (N.D. Cal. July 16, 2019); and _Transaction Secure, LLC v. Formstack LLC_, No. 1:19-cv-3703-SEB-MPB (S.D. Ind. Aug. 29, 2019).

III. **LEGAL STANDARD**

The Supreme Court has established a two-step framework for determining patent eligibility under 35 U.S.C. § 101. *Alice*, 573 U.S. at 217. In "step one," the court determines whether the claims are directed towards an abstract idea or other patent-ineligible subject matter. *Id.* "[T]he claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015). "Under this inquiry, we evaluate 'the focus of the claimed advance over the prior art' to determine if the character of the claim as a whole, considered in light of the specification, is directed to excluded subject matter." *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1384 (Fed. Cir. 2019) (citation omitted).

"Courts must tread carefully when assessing a claim's 'character as a whole' and avoid 'describing the claims at such a high level of abstraction and untethered from the language of the claims [because that] all but ensures that the exceptions to § 101 swallow the rule.'" *Secure Cam, LLC v. TendInsights, Inc.*, 351 F. Supp. 3d 1249, 1254 (N.D. Cal. 2018). Thus, patent claims may recite patent-ineligible subject matter without being "directed to" that subject matter. For example, such a claim may instead be directed to an improvement in how computers operate, *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016), or other specific technological improvements, *Local Intelligence, LLC v. HTC Am., Inc.*, No. 5:17-cv-06437-EJD, 2018 WL 1697127, at *8 (N.D. Cal. Apr. 6, 2018) (denying motion to dismiss under section 101 and *Alice*; "a specific solution, reciting specific implementation detail, which purports to solve a problem within the technology of user interfaces in electronic devices with small screens, is not abstract.").

But if such patent claims instead recite merely using computers as tools, without changing how the computers operate or are configured, they are directed to the ineligible subject matter. *See Enfish*, 822 F.3d at 1336; *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1321 (Fed. Cir. 2016) (distinguishing the patent claim at issue from those found eligible in *Enfish* because it did "not improve or change the way a computer functions"); *Elec. Power Grp.*, 830 F.3d at 1354 (explaining that the *Enfish* claims "focused not on asserted advances in uses to which

- 7 -

existing computer capabilities could be put, but on a specific improvement—a particular database technique—in how computers could carry out one of their basic functions of storage and retrieval of data").

Under "step two" of the governing analytical framework, an inventive application (or "inventive concept in its application") of patent-ineligible subject matter is patent eligible. *Alice*, 573 U.S. at 217–18 (citations omitted). Therefore, if the claim is directed to an abstract idea, the court must consider whether the "additional elements" in the claim, beyond the abstract idea, "both individually and 'as an ordered combination,'" "'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217; *accord OpenTV, Inc. v. Apple Inc.*, No. 5:15-cv-02008-EJD, 2016 WL 344845, at *4 (N.D. Cal. Jan. 28, 2016) (granting motion to dismiss based on section 101 invalidity under *Alice*; "[s]uch a transformation … requires more than just the recitation of the abstract idea followed by the words 'apply it' or a generic computer's implementation of routine and well-understood business practices.") This requires an "innovation in the non-abstract application realm." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018).

"Whether a claim is drawn to patent-eligible subject matter under § 101 is an issue of law that we review de novo." *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008) (en banc), *aff'd*, *Bilski v. Kappos*, 561 U.S. 593 (2010). *See also Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018) (holding that "[t]he patent eligibility inquiry may contain underlying issues of fact," but "[p]atent eligibility under 35 U.S.C. § 101 is ultimately an issue of law"), *petition for cert. filed*, *HP Inc. FKA Hewlett-Packard Co. v. Berkheimer*, No. 18-415 (U.S. Sept. 28, 2018).

It is appropriate to address patent eligibility under 35 U.S.C. § 101 at this stage of the case. *See*, *e.g.*, *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759 (Fed. Cir. 2019) (affirming dismissal based on section 101 invalidity under *Alice*).

## IV.    **ARGUMENT**

Under *Alice*, the '921 patent's claims are invalid as a matter of law. As in *Alice*, and myriad progeny of *Alice*, the patent claims here are directed to an abstract idea of processing information

in service of a business transaction, using merely generic computers or other equipment. The '921 patent issued about one month before *Alice*. Accordingly, the Patent Office would not have applied the current patent-eligibility test when reviewing the '921 patent's application. *Cf. Eclipse IP LLC v. McKinley Equip. Corp.*, No. SACV 14-154-GW AJWX, 2014 WL 4407592, at \*3 (C.D. Cal. Sept. 4, 2014) (noting that "it was unclear to . . . the USPTO, that the framework set forth in *Mayo* applied to abstract ideas" for patent applications examined after *Mayo*, but before *Alice*).

In determining whether a given set of patent claims are ineligible for patenting under 35 U.S.C. § 101, the Federal Circuit routinely engages in two forms of analysis. In the first form, it compares a representative claim to patent claims previously analyzed for eligibility—as does the Supreme Court. *See*, *e.g.*, *Enfish, LLC*, 822 F.3d at 1334–35 ("[The Federal Circuit] and the Supreme Court have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases."). In the second form, it also applies the two-step analytical framework of *Alice* to the claims. *Id*. This brief follows this practice of the Federal Circuit by starting with a comparison of the '921 patent claims to the claims declared invalid in the *Asghari-Kamrani* decision, and next applying the two-step framework of *Alice* to the claims.

## A.   The Federal Circuit Has Affirmed Judgment Of Invalidity Under *Alice* Of Very Similar Claims As Asserted Here

As noted, the Federal Circuit has already affirmed invalidity of very similar claims under *Alice*. *Asghari-Kamrani*, 2016 WL 3670804, at \*4 ("The claims are directed to the abstract idea of using a third party and a random, time-sensitive code to confirm the identity of a participant to a transaction."). The decision of the U.S. District Court for the Eastern District of Virginia summarizes the *Asghari-Kamrani* patent's disclosed invention in a manner that in all material respects applies to the later '921 patent asserted here as well:

> According to the Summary of the Invention, "[t]he invention relates to a system and method provided by a Central-Entity for centralized identification and authentication of users and their transactions to increase security in e-commerce." The patent identifies three entities that perform the patent's methods: <u>(1) a "Central-Entity"</u> which "centralizes user's personal and financial information in a secure environment in order to prevent the distribution of the user's information in e-commerce;" <u>(2) a "user"</u> which "represents both a

typical person consuming goods and services as well as a business consuming goods and services, who needs to be identified in order to make online purchases or gain access to restricted web sites;" and (3) an "External-Entity" which "is any party offering goods or services in e-commerce and needs to authenticate the users based on digital identity."

*Id*. at *1 (emphases added) (internal citations omitted).

Likewise, claim 1 of the '921 patent, operates using the same three entities (though labelled slightly differently): (1) the "trusted entity" which "confidentially store[s]" "personal identity information" ('921 patent, 14:1–4); (2) a "person" (*id.*, 13:65) who wants to enter into a transaction and (3) a "transactional entity" (*id.*, 13:66), which is an entity that transacts business with the person and needs to trust "that the person they are transacting with is the true owner of the identity and information used in the transaction" (*id.*, 3:58–65).

The *Asghari-Kamrani* court continued:

Initially, [1] the user signs-up at the Central-Entity and provides his or her "personal or financial information." [2] The Central-Entity gives the user a UserName and Password that he or she will utilize when interacting with the Central-Entity. [3] When requested by the user, the Central-Entity also gives the user a SecureCode, which is "dynamic, non-predictable and time-dependent." [4] The user may then provide his or her UserName and SecureCode to the External-Entity. [5] The External-Entity then sends the UserName and SecureCode to the Central-Entity, which will validate the information and confirm the identity of the user and inform the External-Entity of the result.

*Asghari-Kamrani*, 2016 WL 3670804, at *2 (bracketed numbers added) (internal citations omitted).

Claim 1 of the '921 patent, recites virtually the same steps, namely that [1] the trusted entity receives "personal identity information" ('921 patent, 14:1), [2] stores for the user a "user identifier and a password" (*id.*, 14:5–6), which she will use [3] to request a "unique code" from the trusted entity (*id.*, 14:9–11), [4] which "unique code" is then transmitted to the transactional entity (*id.*, 14:15–18), and thereafter [5] confirmed by the trusted entity to the transactional entity to authenticate the user to the transactional entity (*id.*, 14:20–22). ('921 patent, 13:65–14:22.) Even the additional functionality arguably alleged in the Amended Complaint—generating a unique

- 10 -

code—is laid out in the *Ashari-Kamarani* claims ("generating . . . a dynamic code.") Only the terminology differs: "unique code" vs. "dynamic code/SecureCode," "trusted entity" vs. "Central-Entity," and "transactional entity" vs. "External-Entity."

The below table places side-by-side the patent-ineligible claim 1 of the *Asghari-Kamrani* patent and claim 1 of the asserted '921 patent, demonstrating the remarkable similarity of the two representative claims for patent-ineligibility purposes.

| Asghari-Kamrani Patent - Claim 1<br>(Cleveland Decl., Ex. B at 6:24–47.) | Asserted '921 Pat. Claim 1<br>(ECF No. 24-1 at 13:65–14:22.) |
| --- | --- |
| 1. A method for authenticating a user during an electronic transaction between the user and an external-entity, the method comprising:<br><br>receiving electronically a request for a dynamic code for the user by a computer associated with a central-entity during the transaction between the user and the external-entity;<br><br>generating by the central-entity during the transaction a dynamic code for the user in response to the request, wherein the dynamic code is valid for a predefined time and becomes invalid after being used;<br><br>providing by the computer associated with the central-entity said generated dynamic code to the user during the transaction;<br><br>receiving electronically by the central-entity a request for authenticating the user from a computer associated with the external-entity based on a user-specific information and the dynamic code as a digital identity included in the request which said dynamic code was received by the user during the transaction and was provided to the external-entity by the user during the transaction; and<br><br>authenticating by the central-entity the user and providing a result of the authenticating to the external-entity during the transaction if the digital identity is valid. | 1. A method for authenticating a person's identity to a transactional entity using a trusted entity with a secure repository of a person's personal identity information, comprising:<br><br>receiving personal identity information at a trusted entity computer system, the personal identity information being confidentially stored by the trusted entity computer system;<br><br>in the secure repository, storing a user identifier and a password that are associated with, but do not contain, the personal identity information;<br><br>at the trusted entity computer system, receiving a request from the person for a unique code, the request including the user identifier and the password, the person's identity having been previously authenticated by the trusted entity computer system;<br><br>providing the unique code to the person, the unique code comprising a person identifier and a key, wherein the unique code is thereafter transmitted to a transactional entity to identify the person without providing the personal identity information to the transactional entity; and<br><br>the trusted entity computer system confirming the unique code to the transactional entity to verify the person's identity. |

1    As the side-by-side comparison shows, the only steps in the '921 patent claim not in the

2  *Asghari-Kamrani* claim relate to establishing the user's account at the trusted entity and the person

3  providing her user identifier and password to the trusted entity when making her request. But,

4  those steps are discussed in the specification of the *Asghari-Kamrani* patent (*see* [1] and [2],

5  above). Moreover, the idea of establishing a user account and/or logging into that account with a

6  user identifier and password is clearly abstract and cannot save the claims under *Alice.*

7    The *Asghari-Kamrani* court's analysis of invalidity under *Alice* applies here as well in all

8  material respects, including the following statements:

9       Nothing about the concept behind the patent claims depends upon
        their implementation by computers. As USAA points out, the
10      concept could easily be performed either by hand or, more simply,
        with technologies much older than computers.
11
        ***
12
        It is true, as Plaintiffs argue, that there are advantages to performing
13      the claimed method on computers. However, these advantages do
        not transform the method into one directed to an improvement of
14      computer technology. Again, a comparison with *Alice*, the leading
        Supreme Court case on this issue, is instructive. The risk that one
15      party to a transaction will not follow through on its obligation is
        undoubtedly magnified for electronic transactions, and there are
16      advantages to performing intermediated settlement using computer
        technology. This was not enough to save the claims in *Alice.*
17
        ***
18
        Considered as an ordered combination, the claim elements do not
19      add anything inventive to the abstract concept underlying them.
        They simply instruct a generic computer or computers to verify the
20      identity of a participant to a transaction using a randomly generated
        code. They do not "purport to improve the functioning of the
21      computer itself." "Nor do they effect an improvement in any other
        technology or technological field."
22

23  *Asghari-Kamrani*, 2016 WL 3670804, at *4–5 (citations omitted).

24    Additionally, Plaintiff has added allegations to the Amended Complaint, regarding the

25  "unique code," in an apparent attempt to save the claims. (ECF No. 24, ¶ 23 ("transform[] personal

26  identity information . . . that is easily decipherable by providing a unique alpha-numeric code

27  containing that same information that is undecipherable to the human eye.") However, just as the

28

- 12 -

court noted in *Asghari-Kamrani*, the allegations here at best support that the '921 patent claims are directed to two abstract ideas, which does not remove the combination from "the realm of the abstract":

> The claims are directed to the abstract idea of using a third party and a random, time-sensitive code to confirm the identity of a participant to a transaction. This formulation is admittedly verbose. It is verbose because the patent claims combine two abstract ideas: the use of a third party intermediary to confirm the identity of a participant to a transaction and the use of a temporary code to confirm the identity of a participant to a transaction. It is an obvious combination, and nothing about the combination removes the patent claims from the realm of the abstract.

*Asghari-Kamrani*, 2016 WL 3670804, at *4–5.

In the instant case, Plaintiff alleges in the Amended Complaint that the '921 patent "reduces the identity theft problem by relying solely on authentication between the trusted entity and transactional entity" (ECF No. 24, ¶ 22) and "generating unique alpha-numeric codes" (*id.*, ¶ 18). The *Asghari-Kamarani* patent likewise disclosed that the Central-Entity generates a unique code by combining a SecureCode ("which is 'dynamic, non-predictable and time-dependent.') with user's information such as UserName, which contains all the information needed by the Central-Entity to identify the user. 2016 WL 3670804, at *2. There is simply no plausible *Alice*-relevant distinction between asserted claim 1 of the '921 patent and the invalidated claim 1 of the *Asghari-Kamrani* patent.

Moreover, *Asghari-Kamrani* is merely one in a long line of Federal Circuit decisions declaring patent ineligible patent claims similar to those in the '921 patent. *See Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 907, 912 (Fed. Cir. 2017) (holding abstract claims directed to a "method for verifying the authenticity of a mail object" using unique encoded data); *Smart Sys. Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1372 (Fed. Cir. 2017) ("the formation of financial transactions in a particular field (i.e., mass transit) and data collection related to such transactions"); *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1054 (Fed. Cir. 2017) ("processing an application for financing a purchase"); *Recognicorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) ("standard encoding and decoding, an abstract concept long

utilized to transmit information."); *Elec. Power Grp.*, 830 F.3d at 1353 ("collecting information, analyzing it, and displaying certain results").

The Federal Circuit also has non-precedential decisions invalidating claims directed to various ideas related to "authentication." For example, claims directed to "receiving, authenticating, and publishing data" were declared invalid in *EasyWeb Innovations, LLC v. Twitter, Inc.*, 689 F. App'x 969, 971 (Fed. Cir. 2017) (non-precedential). Claims for "controlling access, by at least one authentication server, to protected computer resources," were declared invalid as "directed to the abstract idea of controlling access to resources." *See Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1017–18 (Fed. Cir. 2017) (non-precedential).

Similar claims also have been invalidated by district courts, affirmed without opinion by the Federal Circuit. For example, the Federal Circuit affirmed invalidity under *Alice* of patent claims reciting "[a] method of authenticating a dispatch and contents of the dispatch successfully transmitted from a sender to a recipient" that used a "noninterested third party" as an authenticator. *GoDaddy.com LLC v. RPost Commc'ns Ltd.*, No. CV-14-00126-PHX-JAT, 2016 WL 3165536, at *8 (D. Ariz. June 7, 2016), *aff'd*, 685 F. App'x 992 (Fed. Cir. 2017).

In sum, the claims of the '921 patent are materially indistinguishable from a long line of patent claims declared invalid under 35 U.S.C. § 101, and thus should likewise be ruled invalid. Their patent ineligibility also is apparent under the two-step analytical framework of *Alice*, as explained below.

### B.    *Alice* Step One: The Claims Are Directed To An Abstract Business Idea

The focus of representative claim 1 is an abstract, information-based business idea.

The "first stage of the *Alice* inquiry looks at the 'focus' of the claims." *SAP Am.,* 898 F.3d at 1167. Here, the claims and specification of the patent make clear that the claims' focus is using a trusted third-party entity with a secure repository of a person's personal identity information to authenticate that person's identity, *i.e.*, intermediated authentication. A trusted entity acts as an intermediary between the person and a business for purposes of authenticating that person to that business. In other words, the claims are directed primarily to the idea stated in the preamble of

claim 1: "authenticating a person's identity to a transactional entity using a trusted entity with a secure repository of a person's personal identity information." *Cf. BASCOM Global Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1345, 1348 (Fed. Cir. 2016) (quoting part of a patent claim's preamble as the articulation of the abstract idea to which the claims were directed).

The claims' idea of intermediated authentication is an example of an abstract business idea that merely processes information in service of a business transaction or other human activity. "The Federal Circuit [has] explained that information is intangible, and hence abstract." *Secure Cam*, 351 F. Supp. 3d at 1255 (citation omitted). Therefore, "the Federal Circuit has found that claims directed at collecting information, analyzing it, and displaying results of the collection are focused on an abstract idea." *Id.*; *accord Univ. of Florida Research Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367–69 (Fed. Cir. 2019) (invalidating under section 101, claims directed to "collecting, analyzing, manipulating, and displaying data."); *Credit Acceptance Corp.*, 859 F.3d at 1056 ("data processing to facilitate financing is a patent-ineligible abstract concept").

This abstract "intermediated authentication" idea is akin to the abstract idea of "intermediated settlement" in *Alice*, in which a computer acts as a "third-party intermediary" to mitigate "the risk that only one party to a financial transaction will pay what it owes." *Alice*, 578 U.S. at 212. Here, a computer also acts as an intermediary—*viz.*, the "computer system" of the "trusted entity"—between two parties to a transaction, also to mitigate risk—the risk being that the person is not who she says she is. As in *Alice*, the claims here recite a merely generic computer implementation of the idea. *Id.* at 212, 221, 223. As in *Alice*, the claims here are directed to "a method of organizing human activity." *Id.* at 220. And, as in *Alice*, "[t]he method claims do not … purport to improve the functioning of the computer itself." *Id.* at 225.

The '921 patent's alleged advance over the prior art is directed to a business and data solution using existing computing tools, not to technological improvements to how those computing tools operate. The claims are not directed to any improvements to a computer or other technology: they do not make a computer more efficient, transmit information in an improved way, nor improve storage capacity or technological security. *See SAP Am.*, 898 F.3d at 1168 (noting

that, in *BASCOM Glob. Internet Servs.*, 827 F.3d at 1348–49 and *Enfish*, 822 F.3d at 1335–36, the "claims were patent-eligible because they were directed to improvements in the way computers and networks carry out their basic functions"); *Intellectual Ventures I LLC.*, 838 F.3d at 1321 ("[U]nlike the claims at issue in *Enfish*, which involved a 'specific type of data structure designed to improve the way a computer stores and retrieves data in memory,' … [the claim here] does not improve or change the way a computer functions."); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612–13 (Fed. Cir. 2016) ("[T]he focus" of the specification "and of the claims was not on an improved telephone unit or an improved server," rather, the telephone unit is "merely a conduit for the abstract idea."); *Elec. Power Grp.*, 830 F.3d at 1354 ("In *Enfish* … the claims at issue focused not on asserted advances in uses to which existing computer capabilities could be put, but on a specific improvement—a particular database technique—in how computers could carry out one of their basic functions of storage and retrieval of data.").

One sure sign that the patent's <u>solution</u> is a purported business innovation and not a technological innovation is that the patent's <u>problem</u> is a business problem not a technological problem. *Cf. ChargePoint*, 920 F.3d at 768 (affirming Rule 12(b)(6) dismissal of complaint based on invalidity under *Alice* and section 101, based in part on how the patent described the problem and its solution: "the specification never suggests that the charging station itself is improved from a technical perspective, or that it would operate differently than it otherwise could. Nor does the specification suggest that the invention involved overcoming some sort of technical difficulty in adding networking capability to the charging stations.").

The patent's entire disclosure confirms that its focus is the abstract idea of intermediated authentication, rather than a technological improvement. The patent's title restates part of the abstract idea: "System and method for authenticating a person's identity using a trusted entity." ('921 patent, 1:1–3). Its "Background" section describes the identity theft problem, and in particular that providing a SSN is no longer a reliable indicator that the person is who she says she is, because one's SSN could be known by others. ('921 patent, 1:21–2:29.) Fig. 1 of the patent

shows the idea of having a "trusted entity" serve as an intermediary between the person and the business ("transactional entity") wishing to conduct business with that person and issuing and confirming with processed information (a "unique code") to authenticate that person. The specification then describes alleged "advantages of using a third party trusted entity." (*Id.*, 6:28–58.)



FIGURE 1

Conversely, nothing in the patent hints at any technological shortcomings of existing computers or technological improvements to any computer or other machine.

Consistent with this focus of the entire patent, claim 1 is directed to intermediated authentication. Claim 1 recites a series of communications between three entities: (1) a person's personal information is received by a trusted entity, which information is confidentially stored, (2) a request for a unique code is received by that trusted entity, (3) a unique code is provided to the person and later provided to a transactional entity, without personal identity information from the person, and (4) the trusted entity confirms the unique code to the transactional entity, to authenticate the person without their personal information being disclosed to the transactional entity. ('921 patent, 13:65–14:22.) Thus, the trusted entity acts as an intermediary between the person and the transactional entity.

The claim does not focus on, specify, or restrict <u>how</u> the information is received, stored or provided. This is unsurprising because the patent does not purport to describe any new or improved ways to receive, store or provide information. On the contrary, the patent states that the information may be exchanged by humans, which is one hallmark indicator of patents invalidated under *Alice*. Specifically, the patent discloses that the "communication interface" between the trusted entity

and the person may be a human. ('921 patent, 6:67–7:11.) So too the "interface" between the person and the transactional entity may be a human. (*Id.*, 8:25–40.) And the interface between the transactional entity and trusted entity also may be a human. (*Id.*, 8:25–40, 8:63–9:1.) Thus, although the claim's trusted entity has a "computer system," the information communication steps of the claims can be accomplished simply by people talking or passing notes. *Cf. CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011) (invalidating a method claim because the steps "can be performed in the human mind, or by a human using a pen and paper").

Representative claim 1 does not recite that any of these steps of receiving, storing or providing information changes or improves how the computer performs its basic operations. The patent here concerns the age-old concerns of identity theft and insufficient trust to conduct business. There is no allegation in the patent (or the Amended Complaint) that these problems arise from or are unique to the use of computers.

The Amended Complaint asserts that the patent claims another idea: "transform[ing] personal identity information (SSN, birthdate, etc.) that is easily decipherable by providing a unique alpha-numeric code containing that same information that is undecipherable to the human eye." (ECF No. 24, ¶ 23). This idea, even if purportedly present in the claims, is not technical in nature; rather it is the encoding of information, which is mere data manipulation of a type the Federal Circuit has declared abstract repeatedly. For example:

> We find that claim 1 is directed to the abstract idea of encoding and decoding image data. It claims a method whereby a user displays images on a first display, assigns image codes to the images through an interface using a mathematical formula, and then reproduces the image based on the codes. *See* J.A. 35 (col. 1 ll. 23–40). This method reflects standard encoding and decoding, an abstract concept long utilized to transmit information. *Cf. Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340–41 (Fed. Cir. 2017) (organizing, displaying, and manipulating data encoded for human- and machine-readability is directed to an abstract concept). Morse code, ordering food at a fast food restaurant via a numbering system, and Paul Revere's "one if by land, two if by sea" signaling system all exemplify encoding at one end and decoding at the other end.

*Recognicorp,* 855 F.3d at 1326.

1    Thus, even if the patent claims were also directed to this abstract encoding idea, that would

2    not save them from being abstract. *Id.* at 1327 ("Adding one abstract idea (math) to another abstract

3    idea (encoding and decoding) does not render the claim non-abstract.")

4       In sum, the claims are directed to an abstract idea under *Alice* and its above-cited progeny.

5       **C.    *Alice* Step Two: The Claims Add No Inventive Application**

6       Before determining under step two of *Alice* whether claim elements provide an "'inventive

7    concept' in application" of the abstract idea, *SAP Am.*, 898 F.3d at 1168–69, a court first must

8    identify those claim elements that are not abstract, *id.*

9       As discussed above, the claims here are directed to the abstract idea of intermediated

10   authentication. The claims add no physical-realm inventive application to this abstract idea.

11   Instead, the only arguable non-abstractions they recite are entirely generic: "computer system" and

12   "secure repository." ('921 patent, 13:66–67, 14:1–2.)

13      Nothing in the '921 patent purports to describe a new or inventive computer system or

14   secure repository. On the contrary, the patent uses these terms generically, stating for instance:

15   "the secure repository 224 can be a secure database, server, or other combination of electronic

16   storage and retrieval system." ('921 patent, 4:47–49.) The patent figures (below) portray the

17   "secure repository" as a proverbial black box (cylinder).

18

19

20   

21

22

23

24

25   Figure 2                                             Figure 3

26

27   The specification generalizes that the secure repository could even be a "physical facility." ('921

28   patent, 4:47–61.) Indeed, nothing in the claims precludes using a conventional computer and

- 19 -

"secure repository" from 1956, at the SSA for instance, performing its basic operations in conventional fashion. (*See* Cleveland Decl., Ex. C.) As explained above, combining an abstract business idea with generic computer equipment, is not patent eligible.

Some steps in the claims are mere data gathering steps, such as the trusted entity receiving personal identity information. Other claim language recites a mere field of use, such as the entity receiving the unique code being a "transactional" entity. And, as noted, the claims recite generic equipment, namely a "computer system" and "secure repository." But, the law is well-settled that reciting routine, well-known, and conventional elements, limiting an idea to a particular technological environment, implementing ineligible subject matter on a computer, and data gathering all are insufficient to provide an inventive application or concept. *See Alice*, 573 U.S. at 221–25; *SAP Am.*, 898 F.3d at 1170 (rejecting an argument that the inclusion of "'parallel processing' computing architecture" in a claim rendered it patent eligible, where, "[t]o the extent that parallel processing is discussed in the specification, it is characterized as generic parallel processing components—not even asserted to be an invention of [the patentee]—on which the claimed method could run"); *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1335 (Fed. Cir. 2015) ("The steps in Versata's claims (e.g., arranging, storing, retrieving, sorting, eliminating, determining) are conventional, routine, and well-known."); *OpenTV*, 2016 WL 344845, at *5 ("These claims merely apply the well-known concept of credential verification to web-based interactive television applications."). Also, a claim's "use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept." *ChargePoint,* 920 F.3d at 774 (quoting *BSG Tech. LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018)).

Representative claim 1, therefore, is unlike patent claims (1) rooted in and improving computer technology, as in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014), or (2) reciting a novel and advantageous configuration of physical devices, as in *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1348–49 (Fed. Cir. 2017), or (3) reciting a particular

physical transformation of a particular article, as in *Diamond v. Diehr*, 450 U.S. 175, 178 n.3, 184 (1981) (transforming "raw, uncured synthetic rubber, into a different state or thing").

Everything else in the claims is merely information (*e.g.*, "personal identity information," "user identifier," "password," and "unique code") and information processing (*e.g.*, "receiving" information, "stor[ing]" information, "providing" information, "transmit[ing]" information, and "confirming" information) in service of this business idea.

Nothing in the patent's specification or claims, and nothing in the Amended Complaint describes <u>how</u> the claimed "unique code" is generated or <u>how</u> any information is allegedly transformed. Rather, what little is in the specification as to generating the unique code, is explained only in <u>functional</u> terms. ('921 patent, 4:15–17 ("The unique code links the identity information with the person using that information"), 7:24–25 ("The key can be associated with a person identifier 232 which together can form a unique code"), 11:44–46 ("In this embodiment, the person 360 may be granted a key 344 associated with a person identifier 342, combined to form 45 a unique code"), 13:28–29 ("Then, the trusted entity can grant a key, associated with a person identifier to form a unique code 620."), 16:16–17 ("generating a single-use key associated with a person identifier to form a unique code"), Fig. 6 ("Granting the person a key, associated with a person identifier to form a unique code, the key being obtained from the trusted entity").) Purely functional language does not provide "a 'specific improvement to the way computers operate.'" *Univ. of Florida Research Found., Inc.*, 916 F.3d at 1368 (emphases in original, internal citations omitted) ("Neither the … patent, nor its claims, explains *how* the drivers do the conversion …. [T]he drivers are described [in the Specification] in purely *functional* terms . . . .); *see also Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338 (Fed. Cir. 2017) (affirming patent invalidity under 35 U.S.C. § 101 where the claim "recites a method for routing information using result-based functional language. The claim requires the functional results . . . but does not sufficiently describe how to achieve these results in a non-abstract way," even under the patent owner's proposed constructions.), *cert. denied*, 139 S. Ct. 378 (2018).

Moreover, transforming one type of information to another type of information does not

in and of itself improve computer functionality. *Berkheimer v. HP Inc.*, 881 F.3d at 1367 ("That the parser transforms data from source to object code does not demonstrate non-abstractness without evidence that this transformation improves computer functionality in some way.") Likewise, the "improvement" of "information" is not an improvement rooted in computer technology. *BSG Tech. LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) ("[A]n improvement to the information stored by a database is not equivalent to an improvement in the database's functionality."); *see also Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1347 (Fed. Cir. 2018) (internal citations omitted) ("The asserted improvement here is the presentation of information in conjunction with other information. Such an information-based improvement is not an improvement 'rooted in computer technology.'") The allegations in the Amended Complaint assert nothing more than an improvement to the information, alleging that it makes the information "undecipherable to the human eye."

An "important clue" to patent eligibility is whether the patent claim recites a particular machine or particular transformation of a particular article. *Bilski*, 561 U.S. at 604. This particular machine or particular transformation test "can provide a 'useful clue' in the second step of the *Alice* framework." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716–17 (Fed. Cir. 2014) (internal citations omitted) ("manipulations of 'public or private legal obligations or relationships, business risks, or other such abstractions cannot meet the test because they are not physical objects or substances, and they are not representative of physical objects or substances.'"). This "important clue" as applied here further supports granting this motion. These claims recite no particular machine and no transformation of any particular article into a different state. Instead, the claimed methods process information and use generic equipment in service of an allegedly innovative business idea. Merely transforming information is insufficient. *CyberSource Corp.*, 654 F.3d at 1372.

Finally, the attorney arguments contained in the Amended Complaint (e.g., allegations that the alleged invention "represents an improvement in the art" (¶¶ 21, 23), "represents an improvement in computer technology" (¶ 22), or solves "a problem uniquely suited to the

Internet" (¶ 25)) are vague assertions of alleged improvement; those unsupported conclusory statements should not be considered by this Court. *Glasswall Solutions, Ltd. v. Clearswift Ltd.*, 754 F. App'x 996, 999 (Fed. Cir. 2018) ("Glasswall cannot render its complaint immune from dismissal by merely asserting that its methods are 'novel' and 'improve the technology used in electronic communications.'").

Nothing in the patent nor the Amended Complaint identifies any arguably novel, non-obvious or inventive "additional elements" in the claims in addition to the abstract idea itself.

### D.   Claim 1 Is An Appropriate Representative Claim

Stripe understands that there is no dispute regarding the appropriateness of using claim 1 as a representative claim for the purpose of determining whether or not the '921 patent claims eligible subject matter. (Cleveland Decl., Ex. A at ¶ 4.) Even if Plaintiff now disputes this, where the claims "are substantially similar and linked to the same" abstract idea, analyzing a representative claim is proper. *Content Extraction & Transmission LLC*, 776 F.3d at 1348.

The additional claims of the '921 patent merely further describe the information content or otherwise provide additional non-technical details, while continuing to focus on the same idea as representative claim 1. Two dependent claims narrow the content of the information (claims 4–5) but they do not change its nature as information being exchanged in service of intermediated authentication. Other dependent claims recite storing other information (claims 6–7[4]), but do not specify some allegedly innovative way to store this information. Dependent claims 8 and 9 recite that the person provide answers to predetermined questions, but do not provide a technical implementation of how to ask or answer such questions. Dependent claim 10 recites merely that the trusted entity may trust some unspecified data and "other trusted entities," which, again, is part of a business idea, not a purported technological innovation. Dependent claim 13 recites a "transactional user interface," which may sound technical but which the patent itself specifies may be a human. ('921 8:37–40 ("The transactional entity user interface can be a web page, computer

---

[4] Claim 7 depends from claim 1 but refers to a "single-use key," which has no express antecedent in claim 1. But despite this uncertainty, it recites merely storing information.

terminal, computer display, automated telephone system, telephone operator, or representative employed by the trusted entity 220.")) Dependent claim 15 recites merely that the transactional entity has an account at the trusted entity, another part of a business idea not a technological improvement. Dependent claim 17 recites merely that the "unique code" issued by the trusted entity is specific to the transactional entity, another part of a business idea. Claim 19 adds a conventional printing step. Other claims simply add examples of the types of information (e.g., name, birthday) or entities (e.g., bank). The other independent claims (claims 2 and 20) merely add more information descriptions or processing, namely that the "key" is used only once, and that the person's photograph is displayed to the transactional entity. None of these other claims deviate from the focus of representative claim 1: intermediated authentication.

### E.    This Invalidity Defense Is Ripe For Decision Under Rule 12

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint must allege facts sufficient to state a claim to relief that is "plausible on its face." *Secure Cam*, 351 F. Supp. 3d at 1253 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).).

Post-*Alice*, patent infringement complaints often are dismissed under Fed. R. Civ. P. 12(b)(6) because the asserted patent claims are invalid under the abstractness exclusion to patent eligibility under 35 U.S.C. § 101. *See, e.g.*, *ChargePoint*, 920 F.3d at 766–75 (affirming dismissal based on section 101 invalidity under *Alice*); *Univ. of Florida Research Found., Inc.*, 916 F.3d at 1367–69 (same); *Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1384–86 (Fed. Cir. 2018) (same), *cert. denied,* 139 S. Ct. 813 (2019); *Secured Mail Sols. LLC*, 873 F.3d at 912–13 (same; the Federal Circuit has "determined claims to be patent-ineligible at the motion to dismiss stage based on intrinsic evidence from the specification without need for 'extraneous fact finding outside the record.'"), *cert. denied*, 138 S. Ct. 2000 (2018); *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1373 (Fed. Cir. 2016) (same; "[w]e have repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion.)

In accord with these precedents, patent ineligibility here is ripe now for adjudication. This motion does not turn on any disputed claim construction and therefore need not wait for *Markman* proceedings to complete. Claim constructions might narrow or broaden the scope of the <u>information and information processing</u> recited in the claims, but that scope is irrelevant to this motion as even "narrow and specific" abstract ideas are patent ineligible. *See Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 88 (2012).

The Amended Complaint appears to attempt to defeat this motion by alleging that encoding the personal identity information in a "unique code" constitutes "an improvement in computer technology" because the information is "undecipherable to the human eye." (ECF No. 24, ¶¶ 18, 21–25.) But, encoding information is an abstract idea, and even new and useful abstract ideas are patent ineligible. *See supra* at 18–19. Also, this idea of encoding information to be "undecipherable to the human eye" does not depend on or improve computer technology; on the contrary, it dates back to Julius Caesar—for whom the "Caesar cipher" is named—if not earlier. Whether or not the person's SSN is encoded does not change how the "computer system" or "secure repository" work.

A few courts have found material fact disputes over whether a claim's non-abstract elements were an inventive application of the abstract idea. *E.g.*, *Berkheimer*, 881 F.3d at 1368–70. But here the additional elements are merely generic: "computer system" and "secure repository." The Amended Complaint alleges no facts plausibly supporting any innovation in these non-abstract elements.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Amended Complaint for failure to state a plausible claim.

Dated: October 15, 2019                          Respectfully submitted,

                                                 KLARQUIST SPARKMAN, LLP

                                                 By:    */s/Kristin L. Cleveland*
                                                        Kristin L. Cleveland

                                                 Counsel for Defendant
                                                 STRIPE, INC.